Mr. McGlasson, you're appearing on behalf of Mr. Alvarez. Thank you, your honor. Sorry, I got a message coming up on the screen there. Thank you, and may it please the court. Well, I'm sorry, this meeting is being recorded by the host or a partner, and I've never seen that before. Yes, that's what I saw, Judge, I guess what distracted me, I just wanted to roll back the time jet Whitney, what's going on? Yes, we're recording it for the for the website for later for for our public recordings. Never seen that before. I'm sorry. Yes, it pops up sometimes depending on the version of Zoom. So I've been told. Excuse me. No worries. Thank you, Judge. May it please the court. This court granted a COA on three issues in this capital 2254 appeal. The first to involve Mr. Alvarez is Sixth Amendment right to counsel into the effective assistance of counsel. As the court is aware, Mr. Alvarez argues two theories of ineffectiveness, one of presumed prejudice due to primarily the sleeping of lead counsel and the second one of actual prejudice not only due to the sleeping, but also in combination with the failure to investigate, prepare and present a coherent and persuasive defense at both phases of trial and especially at sentencing. The third issue is the DNA due process set of claims involving both Brady claims, failures to disclose significant impeachment evidence regarding faulty lab practices at the now shuttered Houston Crime Lab and forensic witnesses in the case, as well as a due process claim for reliance upon false and unreliable evidence is presented by tainted DNA analyst Christy Kim, who worked for that former HPD lab due to a breakdown in the practices at that lab at all levels and especially in the DNA section in its COA grant COA grant. This court also noted the procedural default ruling in the district court below on the DNA claims. With the court's permission, I'd like to address start by addressing the ineffectiveness set of claims. Appellant is asking this court to grant relief on a presumed prejudice theory relying on this. Let's start out. I want to I want to make sure that I understand procedurally where we are because based on my review of the record, the sleeping lawyer claim was only raised in state court in conjunction with the Vienna Treaty claims. Is that correct? No, Your Honor. Yes, it was. Yes. Yes. And I'm sorry. In the first read, the Vienna Convention claim was, quote, supplemented the CCA determined that the supplementation was not a successor read. And in that supplemental filing, yes, ineffective assistance arguments as well as sleeping was presented when the court also allowed us to remand and stay and abated and remanded to the state court in 2014, I believe it was when Martinez had come down to give the state court an opportunity to address our ineffective assistance of trial counsel claim then. At that time, Your Honor, the sleeping was also again presented. So procedurally, we've got a fully exhausted claim. We know it was again presented. Yes, ma'am. Is a standalone claim. Is that correct? Well, yes, it was presented as a part of the overall ineffective assistance of trial counsel claim and was specifically argued and referenced in both sets of pleadings in state. Was it from the Vienna Convention? I have a record site to the sleeping lawyer claim in the 2000, the later writ application R.O.A. 4646 to 4653. Yes, Your Honor, that that I wouldn't dispute that there's no question that sleeping has been presented and exhausted the facts of sleeping in state court. I hasten to add those facts were the exhausted facts were from the two juror affidavits. This affidavit from Mr. Reyes that's now pending in the carried motion to expand the record and to stay and obey that affidavit is not a part of the record as yet. It was not submitted in state court as the court's aware it wasn't even obtained until the case was already pending before this court. The state has argued that the facts of appellants in effect this claim are not quote egregious applying an operative term from this court's in bank opinion in Verdine. We disagree and especially under the factual circumstances presented in this case. I'd like to just briefly run down, take down those who are all on the same page about those facts. On August 10th, 1999, attorney Fermencio Reyes agreed to represent Mr. Alvarez's retained counsel prior to that date. He had never heard of Mr. Alvarez. He knew nothing about his case. This was 12 days before the capital murder trial began, and it's not as if he inherited a case that had been worked up in any meaningful way. Far from it. Two attorneys indeed had been appointed John Denninger and Barry Hards appointed to represent Mr. Alvarez on August 19th and December 18th of 1998 respectively. Prior to Mr. Reyes's entering the case 12 days before trial, here's what they had done. In February 99, Denninger filed nine boarded plate pretrial motions, only one of which even contained facts specific to Mr. Alvarez's case. In June 1999, less than two months before trial, Denninger and Hards filed two additional motions, one for an investigator and one for a mental health expert. There's also evidence in the record that Denninger had reviewed parts of the DNA's file, including a ballistics report. Mr. Reyes, however, the facts are undisputed and in fact, Mr. Ramirez trial prosecutor commented on this fact in the trial record. Mr. Reyes never reviewed the DA's file in this case before it went to trial or after. And finally, there's evidence that prior counsel met with members of Mr. Alvarez's family, as Mr. Reyes did, in group settings only and briefly, without any time spent preparing testimony or explaining their role as potential mitigation witnesses. That's it. The other two lawyers look at the record in the DA's office? Is there any notice of that? They did, didn't they? Yes, there's evidence in the record that Mr. Denninger, correct, had looked at the DA's file. The prosecutor comments on that when he's also commenting, Mr. Reyes is making some kind of statement about evidence he hadn't seen. And in response to that, Ramirez, the prosecutor says, well, Denninger came by, but Mr. Reyes could have, but never did. And indeed, Mr. Reyes confirms that he never looked at the file in his exhausted affidavit. Why is that significant if Mr. Denninger is side by side with Mr. Reyes through the proceeding? So the reason it's significant is because Mr. Reyes was the one cross-examining state witnesses whose testimony had, there were documents in the DA's file relevant to it. Prior statements, the lead witness for the state, Miguel Reyes, made two or three statements, inconsistent, et cetera. Mr. Reyes did not have those, had not looked at those files. And one of the things that's important to understand is that Mr. Reyes makes clear that this was not a team effort. He's the lead counsel. He says he called all strategy decisions, made all decisions. He and Denninger had never met before this trial, never met after. They never talked outside the courtroom. This was not a team where Denninger is assisting Reyes and back and forth. Mr. McGlasson, it's one thing to assert that shortly after the trial and during the first habeas proceeding, which lasted for many years. It's another thing for Mr. Reyes to come forward some 18 years after the trial, conveniently after Mr. Denninger died, and say that. And my question to you is, how come this issue, Burdine was decided in 2001? That was only a couple of years after the trial. If lead counsel's inability to represent the defendant was a big issue, why didn't an astute during the state habeas? Well, Mr. Ribnick, our contention is that Mr. Ribnick himself was medically impaired. There's a lot of litigation in the state habeas about his Parkinson's disease. He moved to withdraw, was allowed to withdraw because of that. And he's already been representing him for a couple of years at that time, right? Yes, ma'am. That's correct. Parkinson's develops in very odd ways. Some people are barely affected. Yes, ma'am. The point that I wanted to make is that Mr. Ribnick did not do any outside the record investigation. And so, and the only way sleeping was revealed at the outset or ever in this case initially was because of the interviews with jurors. And I don't think Mr. Denninger was capable of mentioning that. You don't think the defendant himself, Alvarez, would have commented on, you know, his lawyer's incapacity? Well, again, the court in Burdine addresses that point, right? I mean, I think there was a state tried to argue in Burdine that Mr. Burdine had slept on his rights or words to that effect. He could have objected, et cetera. The court treated or addressed that issue in Burdine very clearly. Yeah, but in Burdine, the issue was raised immediately in habeas. And you had the state trial court judge and the courtroom deputy. And I forget, there were at least a couple other, there was a plethora of witnesses, not just two jurors. And we went through the entire trial record looking for evidence of, you know, which might not be there, but looking for evidence or recognition that somebody had had to nudge Mr. Reyes awake at any point. Yes, your honor. Can you cite any place that this is documented in the trial court record? No, your honor, and nor could they in Burdine. The point about Burdine that's real important here to respond to your honor's question is Burdine had a, number one, the Burdine sleeping was raised in a successive application just for what it's worth. It was not in the original writ. It was only found out later after the original writ had been denied. And once again, investigators talked to jurors and that's how that began. But the point I want to make here, judge, is that in Burdine, there was a full state court evidentiary hearing. Witnesses were called, judges, prosecutors, court, as you mentioned, court personnel, and of course, jurors that had seen it. All that was subject to adversarial testing, fact findings, et cetera. What we have here is a record devoid of any factual development, despite the fact that at every step of the way, once these facts were alleged in the supplement to the writ that was considered a initial writ in about 2008, I believe it was, once these facts were in the record, at every step in both state and federal court, the appellant sought to develop facts. We sought evidentiary hearings, we sought depositions, subpoenas, and at every step, the courts denied those. So when the state has argued, respondent has argued, well, this case isn't Burdine, Burdine had all this, and the district court does also adopt this analysis. There's no evidence of when he slept. There's no evidence of how- Well, the critical difference though, I mean, there is no evidence in the record, but the other critical difference is Burdine was a solo defense counsel, and here you have Denninger, and again, we went through the entire trial record, and John Denninger was not a bump on a log during this trial. He conducted half of the voir dire, he interrogated a number of the, or cross-examined a number of the police officer witnesses, he made a move for a mistrial, he made objections in virtually, he did one of the two defense closing arguments, you know, he fully participated. And why can we, how can we draw the conclusion based on Burdine that Alvarez had ineffective counsel when one counsel, you may not like the overall representation, but that to me pushes the case into a Strickland paradigm? Well, Burdine does not hold that, Your Honor. Burdine does not make any mention of the lack of, or that this only applies when there's only one lawyer. And the reason why that should not be the court's holding, I would respectfully submit, is that on the facts of this case, at least, and that's how Burdine's holding comes down. It's very dependent on those facts, which again, we don't have a record here except for two juror affidavits and the late filed Reyes affidavit. But on the facts of this case, his participation doesn't undermine the breakdown in the process occasioned by lead counsel's repeated sleeping while he was, while witnesses that he cross-examined were being examined by the state juror. Why couldn't you have developed a state court record? I don't understand why Deninger didn't say something, why there weren't more jurors, why the judge wasn't asked to go on the record. We did. Yes, Your Honor. Sorry, I didn't mean to interrupt. What did Deninger say? Deninger was not, we never were allowed to, we were never allowed to put him on the stand, Your Honor. You couldn't do an affidavit of Deninger? I mean, he didn't die in 2010. And your subsequent state act was, I know it was handled by the TCCA in 2014, but it, but it's very curious to me that he was dead by the time this became a focal issue. Well, yes, actually, you know, to be clear, I want to, it's not even as good for us as that. We raised the sleeping claim in 2008 while he was alive. We approached Don Deninger. We tried to get, excuse me, Your Honor. No. Okay. We approached him. We asked him for his file. We sought to interview him. He was, we were rebuffed at every turn. So that's why we asked for depositions to subpoenas. We wanted to put Deninger, Reyes, jurors, et cetera, on the stand. The court said, no, if you can't, if the court doesn't allow fact development in state court in Texas. But that was in 2008. Correct. Why, why didn't this come up immediately in the initial habeas filing? Because, sorry. Go ahead. This is because Mr. Ribnick didn't go out and talk to anybody. He didn't interview jurors. He didn't interview Mr. Reyes. He didn't interview Deninger. He did nothing extra record. It was- That's not right. Reyes filed an affidavit in 2003 in habeas. That was not as a result of Ribnick's role, Judge. That was because the state had approached Mr. Reyes and asked him for an affidavit. Ribnick did nothing to develop any extra record evidence on any claim. That was an affidavit about the Vienna Convention, wasn't it? Yes. What Mr. Reyes presented- And the state was trying to talk to, talk to getting defense counsel to give an affidavit about the Vienna Convention? That's correct. And he did. And indeed, yeah, he explained it in his second affidavit that when he was approached about the Vienna Convention claim and possible prejudice, the state didn't tell him what the Mexican government had, was prepared to do. And when he found out what they could have done, and when we presented all the information that they funded us to provide, Mr. Reyes quickly recanted that prior, or the meat of that prior affidavit and said, had I known that the government would have done X, Y, and Z, provided funds for investigating, et cetera, and produced the kind of wealth of new evidence, mitigation, et cetera, some 37 witnesses and three experts, he said, I would, of course, have sought assistance from the Mexican government, et cetera. So, but I want to be clear to your point, Chief Judge Owen, we tried to develop facts. We, I mean, yes, Ribnick did nothing. He did not develop it. That's a, that's a true statement. But while the case was still pending in that initial writ. So while there's still live possibilities for fact development, no one has suggested here at this point that those sleeping facts weren't germane and live in that first writ. And when they were revealed, the affidavits were submitted. We had also, we also asked for hearings, all the things that your Honor is pointing to that would have been critical to answer some of these questions. For example, did other people see it? How long? You know, the kinds of things that Verdine goes into and makes. Has the Supreme Court ever adopted Verdine? The Supreme Court only denied cert in Verdine. And as far as I know, they've never addressed the chronic slash Belvey-Cohen issues of sleeping in the context of sleeping. That's correct. I see my time is dwindling. I'd like to at least mention if I could quickly, our argument regarding prejudice on the ineffective assistance claim, if I might, unless the court has further questions. Let me be clear. The state sort of character, Mr. Counsel for Respondent characterizes the prejudice in our case as minimal, cumulative. The district court did too as well. Cumulative, I think the district court used the word outline form. Let me clarify what actually happened and what we claim the jury could have heard, did not due to counsel's ineffectiveness. At sentencing, counsel presented the cursory testimony of five family members, a boot camp instructor, and Dr. Laval, who had administered two personality tests and was still conducting his evaluation while the guilt phase or just after the guilt phase concluded. So when they went to trial, they had no idea what their mental health expert was even going to say. He wasn't done with his evaluation. He wasn't done until the end of guilt phase. That was it. That was the total time for the mitigation. This case was five and a half hours. And as I mentioned, the district court called this acknowledged that the presentation was an outline form when commenting that we think respectfully mischaracterizing this as cumulative. This outline approach, however, was not mitigating. It was like providing the jury a table of contents that tells you where you want to go, but not how to get there. And moreover, not getting you there at all. The jury heard only a list of bullet points and was deprived of details that could have provoked the kind of reason, compassion, moral response that the Eighth Amendment jurisprudence requires counsel to undertake. As I mentioned, we presented the affidavits. I misstated. It was 33 mitigation witnesses, family members, both here in Mexico, teachers in Houston and Mexico, friends, all of whom provided details, important details about Mr. Alvarez's life and their impact on him, both as a child in Mexico, as a middle school and a middle schooler in a gang-ridden neighborhood in Southwest Houston, and as the barely 21-year-old young man. He just turned 21 when all this occurred. As the 21-year-old man that was re-traumatized by the murder of one of his friends just months before the crimes in this case, what the jury heard was testimony about the death of Alvarez's father when he was seven years old, but they were not given the full picture. For example, the jury did not hear that Mr. Alvarez was present immediately after his father was killed and half of his father's face had been blown off, and seven-year-old Juan Alvarez watched his mother crawling on the ground looking for her husband's teeth scattered across the ground. The jury also did not know that this murder, they knew that the father had been murdered, admittedly, but they did not know that this was an isolated, not an isolated incident, but part of a reign of terror exacted against the family. The jury did not hear that the same people who killed his father were harassing the family constantly, and in fact, two years after they brutally killed his father, they murdered his grandfather and his uncle. Juan Alvarez was, in fact, it was as if he was living in a war-like atmosphere in which the male parental figures in his life were being taken out. Another example, the jury is told that Alvarez's crimes were motivated by his desire to seek vengeance, but a competent counsel who performed a proper investigation would have told the jury a far more complicated story and more complex than simply a matter of vengeance. They would have learned how losing multiple male authority figures like this at a young age and being forced to flee, the family had to go from one town to another, leaving their how this would have impacted Mr. Alvarez's world view and the relationships he would form. What would you have us do with all of this? Your Honor, I think it's very simple, and I think what we would respectfully suggest happens is send this back, let the state court develop not only these facts, these are critical facts, and I acknowledge readily to Judge Jones's questioning that we don't have all the facts about sleeping and about the rest of these allegations, give us an opportunity to at least present these facts to the state court, and if they choose not to hold hearings or rule other than procedurally, then we come to district court and at that point we can present our evidence before the district court. The same, by the way, Judge Elrod would apply with our DNA set of claims. There's new law in Texas, 11073, which the operative parts of it did not exist until 2015. Why do we have to do anything with the DNA part? The DNA can continue concurrently, right? It could be going on now. The 64 doesn't have to be stayed, you can have concurrent proceedings going on with that. That's correct, Your Honor. Our argument is not a Chapter 64 argument. Our argument is the DNA evidence in this case is completely faulty and no matter of retesting could occur, and in fact, there's no evidence to retest. They tried to back in the early aughts and there wasn't. So this could not proceed concurrently? No, it could not. We want to proceed under 11071. The same claims we're raising here, due process, NAPU, Giglio, slash Brady claims, only can be presented separately from federal proceedings under the two-form rule. The same rule applies with 11073. Presenting a non-constitutional 11073 claim is not going to exhaust your constitutional claims. No, that's correct. But my point is that if we're allowed to go back, if this court would simply stay these we would be litigating all of these claims. Correct. 11073 is not the constitutional kind of claim that Rines suggests gets remanded. But I'll hasten to add, and I see my time is up. The court has jurisprudence. Gomez, Butler, we've cited these cases. I believe Gomez wasn't cited, and I apologize for that. I will file a Rule 28J letter on that this afternoon. But in those two cases, this court has held under very similar circumstances, whether the claim is constitutional or not, whether the claim has already been exhausted or not. If you look at the jurisprudence in both of those cases, what this court held is if they're intervening factual developments or legal developments that could, in fact, obviate the need for this court's exercise of federal jurisdiction, then by all means, it needs to go back. And in those cases, in both of those cases, that's exactly what happened. Thank you, Your Honors. Mr. Hoffman? May it please the Court. Juan Carlos Alvarez, a gang member, participated in two drive-by shootings that left four people dead. Punishment evidence showed that Alvarez killed another man and had a history of aggravated assault and robbery. Alvarez now claims that he is entitled to federal habeas relief because one of his two because his lawyers purportedly did a bad job presenting mitigating evidence, and because the HPD crime lab purportedly mishandled the DNA testing in this case. But the district court issued a comprehensive opinion that found that Alvarez's claims collapsed on the merits. Regarding his representation, the district court found that his claims fail individually, cumulatively, under ADEPA, under de novo review. He failed to show deficiency. He failed to show presumptive prejudice. And he failed to show strickland prejudice. Concerning his DNA claims, the district court found that they were meritless under de novo review and also procedurally defaulted. In other words, the district court found that Alvarez's claims fail regardless of the standard in any way that you look at them. Starting with the sleeping lawyer claim. This claim fails on both the law and the facts. In Burdine, this court's leading opinion on sleeping lawyers, the defendant only had one lawyer. That lawyer slept, so the defendant got presumptive prejudice. Alvarez had two lawyers, and only one is alleged to have slept. Accordingly, Burdine does not apply, and Alvarez does not get presumptive prejudice. And without presumptive prejudice, his claim falls apart. The district court's decision is consistent with this court's unpublished opinion in Hall v. McFarland. And since this claim is exhausted, Alvarez must show clearly established law for his rule. And as my opponent concedes, there is no clearly established law for the rule that when one of two lawyers sleeps, presumptive prejudice is applicable. In fact, in Hall, the court found that this proposed rule would be Teaguard. But in any event, the district court found that co-counsel objected, he questioned experts, he cross-examined witnesses, he argued to the jury. Even if lead counsel slept, Alvarez still had a competent and functioning lawyer during trial. But Alvarez has no compelling evidence that lead counsel actually slept. His juror affidavits are mostly barred by Rule 606B, and his new affidavit from lead trial counsel can't be considered because it was never presented to the district court and because it's barred by pinholster. But even if this court wanted to consider that affidavit, it just shows that counsel has no independent recollection of sleeping, and he merely says that it's possible or likely. Turning to Alvarez's Wiggins claim, the district court essentially held that the habeas evidence was cumulative to the trial evidence. Because this claim is exhausted, ADEPA applies, but the district court also found that it failed under de novo review. Since ADEPA applies, this court's review of the state court's decision is doubly deferential. This is deference near its apex. The district court correctly found that Alvarez could not show deficiency. Alvarez claims that counsel did not investigate his mental health or gang affiliation, but counsel retained Dr. Ramon Labelle, a psychologist, who met with Alvarez and evaluated him and testified at trial. Alvarez claims that counsel did not investigate his personal background and good character, but counsel met with Alvarez and his family, and five family members testified at trial. They related the pertinent details of Alvarez's life. Additional evidence on those points would have been cumulative. But even if the district court somehow got the deficiency prong wrong, certainly there was no prejudice. In conducting the prejudice inquiry, this court reweighs the aggravating evidence against the mitigating evidence. Here, the district court found that the mitigating evidence was important but cumulative, and it contrasted with the aggravating evidence. Again, Alvarez is criminally responsible for five deaths, and he had a history of aggravated robbery and assault. The district court found that the habeas evidence travels the same pathways and reaches the same end as the trial evidence. The district court, therefore, correctly denied relief on this cumulative claim. Briefly touching on Alvarez's DNA claims, again, the district court found that these claims were procedurally defaulted and meritless. Alvarez argues he can get around his procedural default under Martinez, but in Davila, the Supreme Court reiterated that Martinez only applies to ineffective assistance of trial counsel claims. Alvarez also says that the CCA's Section 5 bar is not adequate in this case under Lee B. Chemna, but he doesn't show the required exceptional circumstances. He doesn't show that the application of the bar was exorbitant or that the application of the bar was somehow pretextual. Alvarez is really just arguing that the CCA got it wrong, but under Bündchen v. Independent and Adequate Bar, this court should decline Alvarez's invitation to grade the state court's papers. And moving on to the merits of the DNA claims, the district court found that Alvarez failed to show that the state had knowledge of the systemic problems of the HPD crime lab. And this conforms with this court's opinion in In re Rabi, which cited Alvarez's district court and noted that the state took immediate action to disclose those problems when they came to light in 2002. Moreover, the district court found that Alvarez failed to show falsity or materiality because retesting confirmed a victim's blood on the weapons found in Alvarez's apartment. And while that DNA evidence was certainly incriminating, it was just one piece of evidence among many. Alvarez was tried under the law of parties. He gave statements about these crimes. He admitted to being present at the crime scenes. He presented. He provided the weapons and the car, and he was involved in the planning. He is criminally responsible based on his admissions alone. The district court correctly found that this claim failed all prongs of all the relevant prosecutorial misconduct tests. Briefly touching on the Rines issue raised by Alvarez, there have already been two Rines days in this case. Third Rines day would be pointless and an abuse of discretion. To get a Rines day, Alvarez has to show good cause for his failure to exhaust. He has to show that his underlying claims are not plainly meritless and that he hasn't engaged in intentional delay. Looking at the 11073 claim, this claim is waived because it was never presented to the district court. And moreover, there is no good cause. Alvarez can't exhaust via 11073. The purpose of Rines is to allow a petitioner to exhaust his state court remedies without running afoul of the statute of limitations. But 11073 is a statutory and non-constitutional remedy. It's a state law creation. It is the Texas bad science writ. There is no federal bad science writ that is recognized by this circuit or the Supreme Court. Also, his DNA claims are plainly meritless. Do we have discretion? Do we have discretion to send that claim? Your Honor, this court has granted Rines stains in the past. However, the court has also remanded the Rines question to the district court for evaluation in the first instance. So yes. So would it be error either way? I think it would. Again, there's no good cause because he can't exhaust his claims this way. And his claims are plainly meritless. The CCA found them section 5 barred twice. And if he tries to raise them again in 11073 application, the CCA will just bar him again because he could have raised the claims in his 2014 application. And it's important to remember that the district court held there was no strong basis for relief even under de novo review. Mr. Hoffman, isn't there a fourth application pending in state court at the present time? I am not aware of an application, Your Honor. There were four applications. One was a mandamus action and three were habeas applications. OK, maybe that's what I'm thinking of. But nothing is pending in state court at this time. As far as I am aware, Your Honor. OK. Can you talk about the rinds with regard to the sleeping lawyer? Yes, Your Honor. Again, there's no good cause for the failure to exhaust because this claim is exhausted. The district court found that it was raised during initial state habeas. Again, the purpose of rinds is to allow for the exhaustion of state court remedies. Go ahead. I'm sorry, Chief. You go ahead. No, go ahead. Has have the state courts ever specifically directly addressed the claim, though? I'm perhaps I'm confusing this. Did they in anywhere in the record in any finding or conclusion? Did they do a drive by and mention it? Or am I missing something? No, Your Honor. However, it was presented in a reply brief during the initial state habeas proceeding and the district court found that was sufficient to exhaust the claim. And I probably that was ill phrased on my part, and I know that, you know, I was speaking colloquial and not trying to talk about this case in any way. That was an ill phrased question. In any event, the claim is plainly meritless. No, no amount of factual development in the state court is going to change the fact that he had two lawyers. And we would also maintain that Alvarez has been dilatory. During his last federal stay, he delayed the filing of his state habeas application while he did a meritless funding mandamus action and appeal. I believe that delayed the filing of his application for several months. This crime was committed. Let me ask you a question about Mr. Reyes's affidavit. If he had thought he was impaired during the trial, and we presume that he's a diligent counsel, and he at least had some knowledge that the Burdine had been decided in 2001, wouldn't he have had an ongoing ethical obligation to inform his client, the subsequent counsel, and the court that he had been unable properly to and the TCCA that he had been unable to properly represent his client? Your Honor, I think that perhaps he would have an obligation. However, I think that Alvarez bears some responsibility for Mr. Reyes. What I'm saying is, instead of doing any of that, Mr. Alvarez tried in the one affidavit that he earlier prepared, or maybe it was two, talked only about the Vienna Convention, nothing about his impairment. He waits until, I think it was, I forget whether it was 2018 or 19, years after co-counsel Denninger had died and therefore could not be questioned about the matter. And then he files his vague affidavit, well, I think I was sleeping sometimes. Yes, Your Honor, I would agree that lead counsel has little credibility on this matter. In fact, in his newest affidavit, he admits that he did not mention his sleeping before. He admits that it's possible or likely that he did now, but that conflicts with his previous affidavits, which simply did not mention the fact. And it raises the question, you know, which- Can we rely on that? Excuse me, Your Honor? Can we rely on that, the credibility? Well, Your Honor, it's the director's position that the affidavit can't be considered because it was never presented to the district court. If we did consider it, could we say it's of not much value in light of what you just were answering to Judge Jones, or can we not do that? I think it's of not of much value because counsel's stories are inconsistent and he lacks credibility on that basis. Are we allowed to do that in our evaluation at this stage? That's what I'm asking. No, Your Honor, I don't think so because this affidavit was never presented to the district court and because it's also barred by pinholster. If we were allowed to consider the affidavit, can we say that it lacks credibility? Yes, Your Honor, I think the court could. I think there's a factual basis for that. One could also say that it's excessively vague and non-probative because it's vague. Yes, Your Honor, I would certainly agree with that. I think at the point that presumptive prejudice does not apply, the district court held that Alvarez would have to show that counsel was sleeping at discrete parts of trial where something important happened and co-counsel was either absent or not functioning. And this affidavit from lead trial counsel does not make that showing. If Your Honors have no further questions, the director would- I mean, I want to talk about the exhaustion of the sleeping lawyer claim. The state, up until this last round of briefing, said we took the position in the federal court that this claim was not exhausted because it was tied to the Vienna Convention claim. And it looks like to me that it was only raised in connection with the Vienna Convention claim in the original habeas proceeding. It might've been raised in 2014, but by that time, the Texas Court of Criminal Appeals had an independent procedural basis for saying it was an abuse of the writ and not reaching the merits. Now, is this claim exhausted or not? Is a standalone sleeping lawyer claim, which is all that's in front of us, exhausted or not? Yes, Your Honor, the district court found that the claim was exhausted. I'm not asking what the district court found. I'm saying, are you affirmatively abandoning your position that it was exhausted? I mean, you've consistently taken that position. It does not appear to me it was exhausted. Are you now affirmatively abandoning it on the record? Yes, Your Honor. We did make that argument to the district court and that argument did not get any traction with the district court. The district court found- We are not the district court. I'm going to ask you clearly, are you authorized to waive that in front of us? Waive what? What is the... Put more plainly, Mr. Hoffman, what is the state's position on exhaustion? Your Honor, we are defending the district court's decision that the claim is exhausted. In the district court, the director did argue that the claim was unexhausted and procedurally defaulted. However, it is a complicated procedural question. The district court found that the claim was exhausted through presentation in a reply brief. It found that the state court did not explicitly apply the section five bar in this case. While I think the director's original argument in the district court was essentially correct, I do not have any problem with the way that the district court did it. I understand- That's not the question. What is the state's position today? He said he's defending it. I don't understand this repetitive questioning of the court. I don't know that we've gotten an answer to the question that I don't understand due to have answered the chief judge's question. What is the state's... I'm not asking what you're defending that the district court did. What is the state's position at this time as to whether it's exhausted or not? Not what are you defending? Not what is a fair argument? What is the state's position? And you don't have... You can argue in the alternative. I'm just asking you, are you affirmatively waiving it? Do you have that authority from your office? Your honor, I do not waive it. However, we have not maintained that in our briefing to this point. So I think that the court would fairly find that we cannot make that argument now. As I said, it is our opinion that the district court found that this claim was exhausted. We have no problem with that decision. We are defending that decision. If your honors have no further questions. The director would ask that the court affirm the district court's denial of federal habeas relief and deny any reinstatement or supplementation of the record. The court- For exactly the same reasons that the district court did or for some, any other, or for a variation of that. Your honor, the court should find that the sleeping lawyer claim fails because Alvarez had two lawyers. And because he fails to show that lead counsel actually slept, the court should find that the Wiggins claim fails because it is cumulative. And the court should find that the DNA claims are procedurally defaulted in merit list. And that is essentially what the district court did. Thank you for your time, your honors. Mr. McLaughlin. Thank you, your honor. Just to go to this question about which way this claim procedurally appears before this court. As your honor has been pointing out, the district court ruled alternatively, both that, or rather, we litigated alternatively, whether this was a waived claim or not. If the court chooses to decide that the claim was not raised, then we've got Martinez's arguments out the wazoo here. As the court knows, Mr. Ribnick's performance in state habeas was abysmal. Judge Jones has been asking a lot of questions about why didn't Ribnick do this, et cetera. Those are questions that ought to be if the court- Mr. McLaughlin. Yes, ma'am. Mr. Ribnick was a fairly well-known defense lawyer. Was he not? He was well-known for one thing, your honor. He failed to file a notice of appeal in a timely manner in a case. And I can cite it for your honor in a letter brief if you choose, if you want. For failing to file a timely notice of appeal and his client, his capital client, did not get appeal on the Fifth Circuit. So he's known for that. Indeed, he was cited in a report as one of the horrible- He was court appointed on the habeas, right? Yes, ma'am. All right. And he had done capital appeals before, had he not? Yes, because the case that he waived the notice of appeal, I know he did that one before. And his client- Well, it's very easy for you. 18 years after the fact, when two lawyers representing this client have passed away to just cast aspersions on them all, you came in, you shored up what you saw as the deficiencies of Ribnick's claim. You could have gotten more evidence about a sleeping lawyer when it mattered. Your Honor, we did everything we could to get more evidence. Well, I didn't see record references, maybe they're there somewhere, to where you were attempting to subpoena the trial judge or Mr. Denninger or whoever. Is that in the record? It is, Your Honor. Did you cite it in any of your briefing at all? Yes, ma'am. We've asked for facts- Okay, well, I'll take your word. I don't want to waste your time. That's fine. I just want to just say in short order, there were probably five to seven motions filed in state court, a few by Mr. Ribnick when he got the DNA letter. He said, give me more information. Most of those were never ruled upon. And then when we got involved, we started asking for discovery on the ineffectiveness claims, et cetera. So there- How come you didn't get Mr. Reyes to fess up? We tried, Your Honor. You began representing Alvarez in 2003? No, I think we- 2006? That's about right, Your Honor, yes. 2006? Yes, ma'am. All right. Why didn't Reyes fess up then? He talks about that in his new affidavit, right? He says, I wasn't ready to talk about this. He didn't, you know, he wasn't willing to let- I confronted him. I said, the jurors have said this. How about it? He says, no. Couldn't have happened. Didn't happen. He says, all this is an affidavit. He takes full responsibility. And to your points, Your Honor's questioning of opposing counsel, surely he had an ethical duty. He had an ethical duty never to take this case. If this were a civil case, this would be a case of malpractice. I think- Now wait, it was Reyes's. It was Alvarez's family that asked him to do it. Yes, Your Honor. But Kyler versus Sullivan makes plain that this court's analysis has no- it makes no difference whether counsel's retained or appointed. The Sixth Amendment requires that Reyes should never have taken this case. It was malpractice to take it. And he had now admits that. We have the extraordinary- I've never seen this, Your Honor, where a lawyer says the following, quote, general health problems associated with blood sugar, et cetera, a major- emergency major surgery, too little time to prepare, and the demands of my ongoing practice in general, quote, prevented me from giving Mr. Alvarez an adequate defense and likely caused me to fall asleep during the trial in full view of the jury who sentenced my client to death. And nothing in that statement says I did not or was not able to function at a critical juncture in the trial when my co-counsel was also unable to function. Well, he- the jurors talk about that, Your Honor. Jared Frierson says he was sleeping during state witnesses that he cross-examined. So I see my time is up. Go ahead and finish your sentence. Well, I just- I just- I guess the point I'm trying to make is we've got this extraordinary set of new facts. We admit that they're new. They are not in the record. This court has authority. And indeed, it's an extraordinary request we're making to- to- to not consider them. I would urge the court, Judge Elrod, not to make credibility findings. Let a tribunal that can see the witnesses, examine the witnesses, cross-examine the witnesses. I have- I have one other question, Mr. McGlasson. Which tribunal, federal or state, are you arguing for? Here's why we urged for state court, Your Honor. Because the very technical reasons Mr. Hoffman's been reciting to. If we go back to district court and we put Reyes- we asked to put Reyes on the stand to support the sleeping lawyer claim, the state is going to argue, I predict, this is not exhaustive because it's not. We need to exhaust these new facts in state court before they're even right for federal district court. So at the very first instance, we should file the writ in the state court on the sleeping with the new affidavit. The state court hopefully will do what it did in Verdine finally, give us an evidentiary hearing. But if it doesn't, at least we can have that hearing in federal court. If we just go back to federal district court on the- on the current record, the district court will bar consideration of the new information as unexhausted. So it has to be in the state court. But at the very- Let me ask one other question. So you're- you're- you're claiming state court, but ultimately, when this gets back, where is it in clearly established law of the Supreme Court of the United States that he's entitled to a new trial? In other words, you can't succeed, it seems to me, unless we rule that Cronic governs the case. You're right. I agree with your honor that we have to appoint to a clearly established Supreme Court authority in support of our opinion. But that- respectfully, your honor, that decision- that are- that issue was decided in Verdine. The state tried to argue Teague and new law, et cetera, in Verdine, and it was rejected. The court in Verdine said, we're just applying pre-existing law, Cronic, and more recently, Belvey- Belvey-Cohen. And importantly, the Belvey-Cohen standard that they were applying was the third prong, namely, whether or not counsel was operating under circumstances that would prevent any reasonable lawyer from operating effectively. That's settled law. Verdine settles it for this panel that the SCOTUS opinion, Belvey-Cohen and Cronic, apply and obtain for this case. Thank you, your honors. Thank you, counsel. We have your arguments. The court will stand adjourned. This case is under submission. Thank you. Thank you, counsel. We appreciate your arguments.